BRUCE COLLINS et al. v. STATE.

No. A-4264.  Opinion Filed Sept. 29, 1924.

(228 Pac. 993.)

(Syllabus.)

1. Evidence—Testimony of Accomplice—Necessary Corroboration. A conviction may not be had on the uncorroborated testimony of an accomplice. If there be evidence corroborating an accomplice, such evidence must go further than to show merely the commission of the offense; it must be such that tends to connect the defendant with the commission thereof.

2.    **Trial—Whether Witness Accomplice—When Question for Court
and When for Jury.** When the facts are not disputed, it be-
comes a question of law for the court to say whether a wit-
ness is an accomplice. On the other hand, where there is a
dispute as to whether a witness did certain things which would
make him an accomplice, the matter is for the jury.

3.    **Same—Question Held for Jury.** In the trial of this cause, the
court submitted to the determination of the jury the question
of whether the witness A. R. was culpably implicated with
the defendants B. C. and G. R. in the commission of the of-
fense; evidence examined, and held, that there is a sufficient
dispute therein to have authorized the trial court to submit
such issue to the jury.

4.    **Evidence—Accomplice Testimony—Sufficiency of Corroboration.**
Evidence corroborating an accomplice need not cover every
material point testified to by the accomplice, or be sufficient
alone to warrant a verdict of guilty. If the accomplice is cor-
roborated as to some material fact or facts by independent
evidence tending to connect the defendant with the commission
of the crime, the jury may, from that fact, infer that he speaks
the truth as to all.

5.    **Homicide—Evidence Sustaining Conviction for Murder.** Evi-
dence examined, and held sufficient to sustain the verdict and
judgment.

6.    **Sufficiency of Instructions.** Instructions examined, and held to
cover the law of the case as disclosed by the evidence.

Appeal from District Court, Rogers County; Charles W. Mason, Judge.

Bruce Collins and George Rowden were convicted of the crime of murder, and they appeal. Affirmed.

On the 23d day of May, 1921, the county attorney of Rogers county filed in the district court of said county an information jointly charging the defendants Bruce Collins and George Rowden with the crime of murder, alleged to have been committed in said county on the 9th day of May, 1921, by shooting, with a premeditated design to effect death, one Ules Jones with a revolver.

On the 28th day of June, 1921, the defendants were ar-
raigned, and each entered a plea of not guilty to the charge,

and the cause was set for trial on September 15, 1921. On September 16, 1921, the cause came on regular for trial and the parties announced ready for trial, a jury was impaneled and sworn, evidence on both sides given, the jury instructed as to the law of the case, and on September 20, 1921, the jury returned a verdict as against both defendants, finding them guilty of murder, and assessing their punishment at imprisonment in the state penitentiary for life. The defendants each excepted and objected to the receiving, filing, and recording of the verdict, which objections were overruled and exceptions reserved, and the court set the 30th day of September, 1921, to pronounce judgment on the verdict.

On the 30th day of September, 1921, the defendants filed a motion for a new trial, which was overruled and excepted to, and the trial court thereupon pronounced judgment against each defendant in accordance with the verdict of the jury.

On March 25, 1922, a petition in error and case-made were filed in this court after all the preliminary steps necessary to the taking of the appeal were made in the trial court.

Numerous errors are assigned in the petition in error. It will not be necessary to set out in detail all of these assigned errors, as the only error relied upon for reversal and argued in the brief is that the evidence is wholly insufficient to sustain the verdict and judgment. A concise statement of the evidence is as follows:

The defendants Bruce Collins and George Rowden were both residents of Rogers county, Okla. Collins was a Cherokee Indian by blood, and resided with his family about seven miles west and a little north of the city of Claremore. As far as disclosed by the record George Rowden maintained no permanent place of abode.

This homicide was committed on Monday, the 9th day of May, 1921, according to the testimony of two state's witnesses, at about 1 o'clock in the afternoon, on a public highway about three-quarters of a mile from the residence of the defendant Collins, in a hollow along said mountainous highway known as "Hickory Hollow." The place of its commission was an out of the way place in a sparsely settled country, on a road that was seldom traveled, and at a point on said road where high embankments were located on either side thereof.

The deceased, Ules Jones, and his brother, Albert Jones, who was also killed, and one James Canfield, commonly called "Arkansas," and the defendant George Rowden had been engaged in the illicit manufacture of whisky for about two weeks prior to the commission of the homicide on the farm of one Russell Foster, who was a son-in-law of the defendant Bruce Collins, at a place on said farm about a quarter mile distant from the Collins home. It appears that Canfield and Ammon Rowden, a nephew of George Rowden, assisted the Jones boys and George Rowden in the manufacture of this whisky, although they had no interest in the partnership.

The undisputed evidence may be summarized as follows: First, That the parties above named were engaged in this illicit business for the time and at the place mentioned. Second. That while they were so engaged, the defendant Bruce Collins at different times visited the place and was seen in possession of the rifle with which it afterwards developed that the homicide was committed. Third. That on the Sunday night immediately preceding the commission of the homicide Ammon Rowden stayed all night at the home of the defendant Bruce Collins and ate breakfast there the next morning. Fourth. That Ammon Rowden left the home

of Bruce Collins shortly after breakfast that morning and went to the camp where this whisky was being made. Fifth. That about 9 o'clock that morning the Jones boys and George Rowden had a settlement of their partnership business, and the Jones boys broke camp with the determination to move their distillery to another location south of the city of Claremore; that preparatory to making such move they loaded the distillery into a farm wagon, together with 500 pounds of sugar and some chops and other materials used in the manufacture of their whisky. Sixth. That before the Jones boys and Canfield had left the camp Ammon Rowden, and afterwards George Rowden, left. Seventh. That when the Jones boys and Canfield left they left in two conveyances, one a surrey, to which was hitched a team of ponies, the property of Canfield, and the other a wagon in which was loaded the distillery and other property, and to which was hitched a team of mules, the property of the Jones boys. Eighth. That in leaving the camp Albert Jones was driving the surrey and Ules Jones was driving a team of mules, and that Canfield was assisting Ules Jones. Ninth. That after they had driven a distance of from two to three miles in a roundabout way, over this rough mountainous road, one of the wheels of the wagon broke down, and that Ules Jones and Canfield unhitched the mules and drove them over to Collins' house, where they borrowed Collins' wagon, and returned to the scene of the breakdown and reloaded the distillery, sugar, chops, etc., into the Collins wagon, hitched the mules thereto, and again proceeded on their way.

As to the other material features of the case the evidence is conflicting. The principal witnesses for the state were Ammon Rowden and James Canfield, commonly called "Arkansas."

Ammon Rowden testified substantially as follows: That he is 29 years old, and had lived in Claremore all his life except six or seven years that he lived in Missouri; that he had been at Collins' home on the 9th day of May, 1921; that he had known Ules Jones for about a year, and that he saw Ules Jones on the Russell Foster place on the 9th of May, 1921, between 9 and 10 o'clock in the morning, and that the defendant George Rowden was there, and that he saw George Rowden talking to Albert Jones and Ules Jones; that he was there about 30 minutes and then returned to the Collins place; that he afterwards saw George Rowden at the Collins place something like an hour after he had seen him at the Russell Foster place; that Bruce Collins was at home; that George Rowden came up and asked Collins if he was ready to go, and Collins said, "just in a few minutes"; that Collins was dressed in a pair of yellow pants, and the witness did not remember what kind of shirt, but that Collins got a pair of blue overalls and put on over these pants; that after Collins did this the three of them, George Rowden, Collins, and himself, all went to Hickory Hollow; that they went out northwest from Collins' place and hit the hollow and went up the road in the hollow and climbed a point right up from the road, a very high point where the road was narrow, and a few trees along the edge of the cliff of rock; that it was tolerably level along the top of the point; that on the way up there he heard George Rowden and Collins talking, and one of them said to the other, "They may go a different road, the other way"; that after they got up on top of the point Collins and George Rowden walked off a few steps and talked a few minutes and came back, and Collins told him to go over to another point south of there; that before they left Collins' house he heard them say that they were going to get this whisky still; that after he was located on this south point he saw a fellow they called

"Arkansas" driving a wagon up the hollow; that he after-
wards heard five shots fired; that when they went up there
Collins was carrying a 25 U. M. C. Winchester rifle, and that
George Rowden had a 45 Colts pistol; that after the shooting
George Rowden came over and got him to take him back
to the place where he had left them; that George Rowden
was carrying a 45 sixshooter in his hand; that when he got
back to the point he saw Collins with the rifle, and that
Collins was looking around on the ground for some empty
shells. He said he had three shells in his hand, but could not
find the others; that he looked down in the road below and
saw Ules Jones in the wagon, in the spring seat on the north
side of the wagon; that he believed Jones was dead; that he
did not move any. He was lying over on his arm over on the
back of the spring seat; that he was about 25 or 30 yards
from Jones; that he did not examine his body; that after
this they left there and went back around the mountain
between 300 and 400 yards of Collins' house and went to
where these boys had been camped on the Russell Foster
place; that he and his uncle went that way, and Collins left
them on the hill; that Collins told them they had better
come that way, and that he (Collins) would come around
the edge of the bluff; that they never did anything after
they got to the Russell Foster place, but then went back by
the trail to the top of the hill between there and Mr. Collins'
house, and there saw Mr. Collins about a quarter of a mile
from Collins' house; that Collins asked George Rowden
where he was going, and George said he was going to Fos-
ter's, "and he told me I had better stay with him. I told
him all right, and then went to Collins' house, and stayed
there all that afternoon and that night and the next day
until between 11 and 12 o'clock"; that while he was there
that evening he heard a conversation between Bruce Collins
and Ben Collins, Bruce's son, in which Bruce Collins told

Ben that he had killed those two Jones boys and that without a chance it would be proved on him, and if it is that he wanted Ben to take care of his mother; that this conversation took place a little after sundown there at the Collins place next to the barn lot fence; that Collins was arrested that night. The witness also testified that when he was on top of the hill, and just before they told him to go over to the other point, and before the shooting, that he told George Rowden and Collins not to hurt anybody; that, if they did not give up the stuff, "very well, don't hurt anybody"; that they said they were going to take it "whether or no"; that at the time of this homicide George Rowden was staying with some folks who lived 1 mile south and about 2½ miles or 3 miles east of the Collins place.

James Canfield testified in substance as follows: That he was twenty-two years of age. That he knew Ules Jones, had known him a little over a month; that he knew Bruce Collins and George Rowden. The first time he had seen George Rowden was in the month of April, 1921; that he saw him and Albert Jones going to town; that on the morning of the 9th of May, 1921, he saw George Rowden at Russell Foster's place with the Jones boys; that they were packing up and loading the wagons to leave there that morning; that Ammon Rowden was down there that morning; that he judged they left there about 9 o'clock; that they had a two seated surrey and a wagon behind it; that after driving a distance the wagon broke down; that Ules Jones unhitched the mules and went to Bruce Collins' home to borrow a wagon; that they broke down about 2½ miles from Collins' home; that he did not see Collins at home at the time; that after they borrowed the wagon, hitched the mules up to the wagon, and started back to the place where their wagon had broken down, he drove the team back to the place, but that Ules walked over there by a different route; that Ules was

there when he got there; that they unloaded the stuff out
of one wagon into the other one, and then started on their
way home; that he did not know which direction they were
going. They stopped at a spring in Hickory Hollow and got
a drink of water. They drove on about 20 or 25 yards from
the spring and were stopped; that there was a big mountain
on each side of the road, and timber and rocks upon them;
that some fellows up on a hill hollered down and asked what
they were loaded with, and Albert Jones told them that
"we are loaded for bear," and they said "unload that whis-
ky and that still out of the wagon," and Albert said "Boys,
if you want it, come down and get it," and they said, "Un-
load that whisky and that still out of that wagon, and do it
damned quick too," and at that time Ules Jones applied a
vile epithet to them and started the team forward with the
wagon, and he did not drive more than 4 or 5 steps until he
was shot; that the witness was right at the back end of the
wagon with a big rock in his hand at the time; that he was
walking behind the wagon so that if anything happened
while they were going up hill he could scotch the wagon with
the rock; that when the shot was fired he looked up the hill
and saw a man up there; that he had on a pair of yellow-
waist overalls and a gray shirt; that when Ules was shot he
dropped over in the spring seat and went to hollering "Oh
me, mercy, lordy! Oh me, mercy, lordy!" and that after that
the witness turned right back down the hollow and left the
way that they had come; that he did not see anybody else
down there, but before he turned he heard a racket up to his
right up on the hill that gave him a scare, and he turned
the other way and went back around the hill and hit another
canyon and went that way, and before he stopped he went
to Collinsville; that on the way to Collinsville he met a fellow
and asked him the way back to Claremore, and was told he
would have to go through Collinsville to get to Claremore

from that place; that when he got pretty near to Collinsville he met another fellow and asked the distance to Collinsville and was told the distance, and after he got to Collinsville he hunted up an officer there and then telephoned to Gene Haverfield at Claremore and talked to Mr. Haverfield over the telephone; that after he had talked to Haverfield he hired a car and drove back to a schoolhouse not far from where the homicide occurred, and met Mr. Haverfield there; that after they met Mr. Haverfield and Mr. Green, the sheriff, and another fellow, that the witness stayed with the car and the other parties went down to Mr. Collins' house and left him with the car; that the last time he had seen Collins before the killing was on the Saturday night previous; that he had not talked to Collins; that Collins had been down to where they had been camped once or twice; that he had heard him talk to the boys down there; that immediately after the conversation took place, when Ules Jones was shot in Hickory Hollow, he saw Bruce Collins step out from behind a big rock on the hill and shoot right down over the peak; that he never came back to the place where the shooting occurred until the next day about 10 o'clock; that when they got back there Ules Jones was lying up in the wagon in the spring seat dead; that he had been shot. Witness could see one bullet hole in his belly and another one through his jaw, that came out down in his neck; that at that time the team which was in front of the mules had turned the surrey around and had come down and hooked the wheels with the wagon, and that was the way they found them the next day; that Gene Haverfield, John Green, and he believed a fellow by the name of Thurmond, was with him at that time; that he had seen Bruce Collins with a gun, what he called a Winchester; that he had the gun down at their camp; that he had seen him with it four or five times. (Witness is then handed a gun, marked State's Exhibit 1, and testifies that that is the

gun he had seen Collins have. The gun had certain distinguishing marks on it that witness identified.) That he only saw one person up. on the hill at the time Ules Jones was shot, and just one shot was fired while he was standing there; that he heard some shots after he left; that they were fired right close together. (Witness indicating by snapping his fingers.) That the only thing that was between the witness and the person doing the shooting was a bunch of leaves that hid him from the person doing the shooting, and after he turned and left there he had a mountain between him and where the shooting was taking place.

E. A. Haverfield testified in substance as follows: That he lived in Claremore, was a deputy sheriff; that he remembered the occasion of receiving a call in regard to the killing of the Jones boys; that after receiving the call he met Jim Canfield at the Limestone schoolhouse and had a talk with him there at the schoolhouse, and then went to Bruce Collins' house and arrested Mr. Collins; that John Green and Bibe Lesco were with him; that he had a conversation with Bruce Collins at the time; that witness asked Bruce Collins where he was between 12 and 1 o'clock that day, and Collins told him he was in his pasture north and west of his house. When arrested Collins said he wanted to change his clothes. He had on a pair of bib overalls, and there was a khaki pair of pants lying on the trunk and he started to change them and take his bib overalls off and asked for these khaki pants, and said, "I will just leave this here," and he came with his bib overalls on. I asked him if he had heard anything of the shooting scrape, and he said he had heard nothing. The next morning witness said he went to the scene of the shooting about 7:30 or 8 o'clock and found Ules Jones killed; that there were two teams and a wagon and surrey there; that at the place there is a deep canyon

and a bluff on the south side of the canyon a distance something like 8,200 feet, pretty nearly straight up; that on the top of the bluff was a place where somebody had been sitting and had trimmed some limbs off of some bushes and had done some whittling, and there was shavings out there and tracks. There was one track went down towards the wagon to something like 30 feet, and then went around the point of the hill and went southwest something like 100 feet, and another track came in there, and they both went across a creek and stopped. He found two empty cartridges, twenty-five Remington cartridges; that Tom Dean found one of them something like 30 feet from the top of the hill, the other one was something like 60 or 70 feet below; that the witness found the last one; that the shells were found something like 100 or 125 feet from the place where the body of Ules Jones was found, one about 30 feet and the other one about 60 or 70 feet from the top of the hill where the people had been sitting; that George Rowden was arrested on the 10th of May, between 9 and 10 o'clock, in the city of Claremore. (The witness then described the wounds that were found on the body of Ules Jones, and the condition in which the bullets were found, and which way they were headed.)

Doctor M. H. Gordan testified in substance as follows: That he is a physician and made an examination of the body of Ules Jones; that he had been shot twice. one bullet passed through his right arm, going into his right groin, hit his left arm going into the groin and cut the femoral artery in two. The other shot had entered at the left jaw and came out on the right side and into the right shoulder, passing through the clavicle bone, hitting the bone and shattering it and into the axillary space; that the bullets ranged downward; that they were copper-jacketed bullets, and had split up, and when they hit the bones they splattered, and only small pieces of them could be found. Some of the small

pieces were recovered. Witness was then shown some small pieces of bullets, and identified one of the pieces as one that was taken from Ules Jones' body, lodged against the femur bone; that Ules Jones was dead and died from the effect of these gunshot wounds.

Tom Dean testified in substance as did the witness Haverfield relative to the finding of the shells at the place of the homicide, although there was some slight discrepancy between the testimony of this witness and Haverfield as to the distance where the shells were found from the top of the precipice and as to the height of the precipice.

J. Herbert Moore testified that he is an undertaker; that he knew Ules Jones in his lifetime, and that he had charge of the body and burial of Ules Jones. (Witness then described the location of the wounds on the body of Jones.)

E. A. Haverfield, recalled, testified for the state that he had recovered a 25 Remington rifle from the house of Bruce Collins on Wednesday morning after the tragedy, and that the rifle, in his opinion, had been freshly shot.

Albert Kirkwood, for the state, testified in substance as follows: That on the 9th day of May, 1921, he was working at Jones, about 8 miles west of town; that he was at Claremore that day and left about 3 o'clock, traveling in a wagon; that on his way home he met the defendant George Rowden about 50 yards west of the bridge over the Verdigris river; that he did not see Rowden until he was right at his mules' heads; that he had a conversation with Rowden there; that John Langley and Mrs. Langley, and a fellow by the name of Bill Dowell was with them; that he and Rowden talked something about a dance that had been held over there, and Rowden asked him if he had seen "Arkansas," and the witness told Rowden he did not know "Arkansas,"

and Rowden said that ''Arkansas'' was about 5 feet tall and wore an old slouch hat and had drooped shoulders, and I told him I did not meet him; that he talked with Rowden two or three minutes; that this was about 5 o'clock in the afternoon. On cross-examination witness testified that the first person he told about this conversation with Rowden was Jim Jones, the man he was working for at that time; that he worked for Jones about two weeks, and has since been working for J. L. Daniels; that he did not know anything about Daniels being mad at Bruce Collins; that Daniels lives about 4 or 5 miles from Jones' place; that he told Jones about the conversation when he got home that evening.

With the testimony of this witness the state rested its case.

### The Defense.

Mrs. Bruce Collins testified in behalf of the defendants in substance as follows: That she is the wife of the defendant Bruce Collins, and lived 7 miles west of Claremore, and had lived there since 1901; that she is a native of the Indian Territory, and a Cherokee Indian by blood; that on Sunday night, May 8, 1921, there was at her house the following persons: Bruce Collins, Ammon Rowden, Columbia Foster, Hazel Moody, Belle Niece, and Ben Collins; that Belle Niece, Hazel Moody, and Columbia Foster were her daughters, and that Ben Collins was her son; that they had breakfast on Monday, May 9th at about 5:30 or 6 o'clock; that she left home about 7 o'clock that morning; went over to Mr. Jury's house, driving a one-horse buggy; that Hazel Moody went with her; that, when they left to go to Mr. Jury's, Ben Collins, Ammon Rowden, and Mr. Niece were at the barn fixing an automobile, but when she got back from Mr. Jury's Ben Collins and Mr. Niece were not at the house; that they had gone a place that day; that she got back home about 11

o'clock; that she loaned one of the Jones boys and this boy they called "Arkansas" the wagon; that she did not pay any attention to which way they left with the wagon; that her husband, Bruce Collins, was at the barn at the time; that they had dinner there at home about 12 o'clock; that Bruce Collins was at home for dinner; that Bruce did not leave home after the witness got back from Jury's with a gun and change his clothes when leaving; that Bruce Collins did not own the gun; that the gun belonged to Ben Collins; that it was not at home that day until Ammon Rowden brought it there about 2 or 2:30 in the afternoon and set it down in the corner of the room; that Ben Collins returned from Tulsa about dark that day; that after dinner Hazel Moody left the place; that the defendant Bruce Collins was at home at the time; that she was at home when Mr. Haverfield came there and took her husband into custody; that she asked Haverfield what was the matter, what he was taking Bruce for, and that Haverfield said that he was accused of killing a man in Hickory Hollow; that this was about 8 o'clock that night; that she did not know of George Rowden having been at their house that day; that she was at home the next evening when the officers came to get Ammon Rowden.

Belle Niece, for the defendants, testified in substance that she is the daughter of Bruce Collins, and was at her father's home on the 8th and 9th days of May, 1921; that the first person to leave the place on the morning of the 9th of May was Ammon Rowden, and that he left there some time between 9 and 10 o'clock; that her husband, Ben Collins, left there about the same time, and also her mother and her sister Hazel went to Mr. Jury's place after a little bit, about the same time; that her mother got home something like 11 o'clock; that after that she again saw the defendant George Rowden there at the house; that he came and stayed

a few minutes and went on; that her father was there at the house at the time; that at the noon hour, just before they ate dinner, one of the Jones boys and this boy they called "Arkansas" came and asked her mother for the wagon; said they had broken their wagon; that the defendant Bruce Collins was not with George Rowden and Ammon Rowden at her house together before noon on that day; that her father, mother, her sister Hazel, Bancroft Jury, and herself all had dinner at her father's house that day; that Ammon Rowden came back to the house something like 2 o'clock that afternoon; that she saw him just as he was going into the house, and that he had a rifle in his hand; that it was her brother Ben's rifle; that she did not recall just where her father was at that time; that her father remained at the house the rest of the afternoon, and was there at supper time; that her brother Ben returned about 6 or 7 o'clock that afternoon; that her husband did not come back with Ben; that her mother brought the boy Bancroft Jury back with her from Mr. Jury's house that day.

Bancroft Jury, a witness for the defendants, testified in substance that he lived about 8 miles from Claremore; was fourteen years old; that he saw Mrs. Collins on the 9th day of May, 1921, about 9:30 o'clock when she came down to his father's house; that he went home with Mrs. Collins; that they got there about 11 o'clock, and that Bruce Collins was there; that he saw Bruce Collins at the barn; that Bruce Collins helped him put the horse and buggy up when they got back to their place; that after they got back to Collins' two boys came there and borrowed a wagon and went away; that this was before dinner; that in the afternoon Mrs. Hazel Moody went over to Mr. Foster's place; that about 2 o'clock that afternoon Ammon Rowden came there to the house; that he never saw Ammon Rowden before he got to the house; that when he first saw him he was standing in the

door; that at this time Bruce Collins was out in the yard reading; that from the time he came back with Mrs. Collins to the time Ammon Rowden came to the Collins home that afternoon Bruce Collins had not been away from the house.

John Wilkerson, a witness for the defendants, testified in substance as follows: That he lives 7 miles west of Claremore; that he knows Jack Falling and George Rowden; that Jack Falling was at his house on the 9th day of May, 1921; that on that day the witness and his wife left home and went to Claremore; that they left about 9 o'clock in the morning and returned about 6 or 7 in the afternoon; and when they left Jack Falling was there, and when they got back that evening he was still there; that at that time Falling was crippled up with rheumatism. .

- Russell Foster, a witness for the defendants, testified in substance as follows: That he lives 4 miles west of Claremore, and was living there on the 9th day of May, 1921; that his place is on the east side of the Verdigris river; that he knows George Rowden and knew him on the 9th day of May, 1921, and saw him on that day; that he had not seen him for about a week before; that George Rowden came to his place about 5 o'clock in the evening on the 9th of May, 1921, and stayed there all night and slept in the same bed with him; that Rowden seemed to sleep soundly and snored.

Ben Collins, a witness for the defendants, testified in substance as follows: That he lived about 7 miles west and one mile north of Claremore; that he was at home on the 8th day of May, 1921, and spent the night there at his father's place that night; that his father, mother, and his sister Mrs. Niece and his sister Mrs. Moody and Ammon Rowden stayed there that night, and Bill Howard stayed until about 11 o'clock, and a cousin and another sister may have stayed there, but witness was not sure about that; that Ammon

Rowden left there early the next morning, and that his mother also left there some time in the morning; that he went to Tulsa the next morning; left about 10 o'clock, and got back just before dark; that Ammon Rowden was there when he got back; that Ammon and his father and all the folks were in the house when he got back; that he had supper at home that evening; that he was the owner of a 25 Remington rifle; that he had loaned this rifle to Ammon Rowden some three or four days before the 9th of May, and that Rowden had not returned it to him when he started to Tulsa that morning; that the next time he saw the gun was when Gene Haverfield and John Green and Tom Dean came and got it. Witness denied that he had a conversation with his father and Ammon Rowden on the evening of May 9th in which his father told him that he killed the Jones boys and that, if they took him away, for him to take care of his mother. (Witness is then shown the gun which had been introduced in evidence, and identified it as his gun.) That there was a fight out at his father's place on the afternoon of May 8th between Ammon Rowden and Albert Jones. On cross-examination the witness admitted that his father met him on the road on his return from Tulsa just north and a little west of Warren Hintchley's house, and that at that time his father was driving a bay horse hitched to a buggy, and that his father then turned around and drove back home behind him; that he judged this to be a little later than 6 o'clock in the evening; that when he met his father up at Hintchley's house he had a talk with him.

Jack Falling, a witness for the defendants, testified that he is sixty-six years old, and a full-blood Cherokee Indian; that on the 9th of May, that year, he was over at his sister's, Mrs. Wilkerson's, and stayed there all day; that he had rheumatism at that time, and could not get around, but was in bed; that George Rowden came to the Wilkerson house

that day; that Rowden got there about 11 o'clock in the morning and stayed there until 4 o'clock in the afternoon; that Mrs. Wilkerson's place is about a mile from the bridge across the Verdigris river on the Collinsville road.

Mrs. Bruce Collins was recalled as a witness in behalf of the defendants, and testified in substance as follows: That her husband, Bruce Collins, hoed in the garden that afternoon, and that late in the evening after her daughter Hazel came back they heard that Russell Foster was bad sick and decided to go over to stay up with him, and started over there, but the horse had been driven to Jury's and back and up to Foster's and back home and he was too tired to go over there; that they met Ben Collins over by Warren Hintchley's place, and that Bruce Collins asked Ben to take him over there, but Ben said it would be dark before he could get there, and he did not have any lights on his car, so they came on back home.

On cross-examination the witness testified that she could have told about this trip over to Hintchley's when she was first on the stand if she had thought about it, but she did not just remember about starting over there at that time. Further in this connection the witness testified as follows:

"Q. Mrs. Collins, you testified positively that they did turn him loose in the pasture, didn't you? A. No, I did not. Q. Who got this horse up, Mrs. Collins, after you decided to go over to Russell Foster's place? A. Well, they hadn't unhitched him when Hazel came with him. Q. Where had Hazel been? A. Hazel had been over to Foster's. Q. You received the information that Russell Foster was very sick, then, didn't you, from Hazel? A. Yes, sir. Q. You heard this little Bancroft Jury testify, didn't you? A. Yes, sir. I did. Q. And you heard him say the horse never left there any more that day, didn't you? A. Well, I don't know whether he thought any more about it than I did before. Q. And you also heard him testify that Mr. Collins never left the place

from the time you folks got back, at 11:00 o'clock, as you say, until the officers came and took him away? A. Yes, sir; I heard him say it. Q. Now, I will ask you to state if you didn't hear your own daughter get on the witness stand and testify to the same state of facts? A. Well, she might have been like I was; she might have never thought about that at all; he never asked it in that way at all."

Hazel Moody, a witness in behalf of the defendants, testified in substance as follows: That she is the daughter of the defendant Bruce Collins, and was at her father's home on the morning of May 9th and drove with her mother to Mr. Jury's on that morning and got back to her father's place about 11 o'clock; that her father was there when she got back; that she left again about 1 o'clock and went over to Lee Foster's place.

Lee Foster, a witness for the defendants, testified in substance as follows: That he lived 4 miles west of Claremore, and was living on that place on the 9th of May, 1921; that his son Russell Foster was living with him on that day, and was sick with the "flu"; that he saw George Rowden on his horse on the evening of the day this killing took place, and Rowden stayed there all night and slept with Russell Foster; that he was up during the night giving Russell Foster medicine; that George Rowden seemed to sleep well and snored right along.

John Vinita, a witness for the defendants, testified in substance as follows: That he lived at Oolagah when he was at home; that on the 9th day of May, 1921, he was working for Joe Gish; that Gish's place is northwest of Claremore; that Gish's place is about a mile and a quarter north of Collins' place; that he had lived over there about two years; that he knew Ammon Rowden when he saw him; that on the morning of the 9th day of May, 1921, he was out hunting some horses for Gish; that he was all over the bottoms south

of Gish's place hunting for these horses; that it was about 10 o'clock in the morning that he saw Ammon Rowden right at the mouth of what was called Spring Hollow; that Spring Hollow is on Collins' place; that Spring Hollow is about a half mile or a little farther from Hickory Hollow; that he just happened to meet Ammon Rowden as he came down through the woods; that Rowden was carrying a rifle, and that he spoke to Rowden and asked Rowden if he would sell the rifle, and Rowden told him it was not for sale.

On cross-examination witness testified that Spring Hollow was east of Hickory Hollow, and that it was nearer the Collins home than his home is; that Spring Hollow is not over 400 yards from the Collins home; that Ammon Rowden was not in sight of the Collins home; that the first person he ever told about seeing Ammon Rowden down there was Ben Collins; that he told Ben Collins about it about a week before the trial.

Bruce Collins, one of the defendants, testified in substance as follows: That he was fifty years old, and had lived in Rogers county about twenty years; that he had seen Ules Jones four or five times in his lifetime; that he had been down to the place where they had been making whisky, which is about a half a mile from his home; that Ammon Rowden stayed at his house on Sunday night May 8th and left there the next morning; that Rowden came back to the house about 10 o'clock and remained a few minutes; that a short time after Ammon Rowden was at the house George Rowden came there and remained about 3 minutes and went away; that he (Collins) stayed at the house all that morning and had dinner there that day and did not go with George Rowden and Ammon Rowden to Hickory Hollow; that he did not kill Ules Jones or have anything to do with it; that Ammon Rowden had the rifle that day; that he saw

him with it when he returned to the house at 10 o'clock that morning and again when he returned to the house about 3 o'clock that afternoon; that it was Ben Collins' gun; that he did not have any conversation with his son Ben Collins near the house late on the evening of May 9th; that he met Ben Collins near Hintchley's place about dark when Ben was coming home from Tulsa on the evening of May 9th; that he never heard anything about the shooting until he was arrested about 8 o'clock on the night of May 9th.

George Rowden, one of the defendants, testified in substance that he is forty years old and had known Bruce Collins six or seven years; that he was born in Missouri and lived there until he was two years old, then lived in Kansas for seven years, then moved to Oklahoma; that he is troubled with his eyesight; that he was interested in the distillery which the Jones boys were running; that they had been running it about two weeks before the shooting; that they had a settlement of their business on the morning of May 9th about 8 o'clock; that he spent the night of May 8th down at the camp with the boys; that Ammon Rowden came down there on the morning of May 9th; that he and Ammon Rowden were not on very good terms with each other; that Ammon Rowden did not have any gun when he came to the camp, but left there with a rifle—a 25 Remington rifle; that he never saw Ammon Rowden any more that day after he left the camp with the rifle; that he never saw Mr. Collins on the 9th of May to talk to him; that he learned of the shooting at Hickory Hollow when he was in Claremore on the morning of May 10th; that after he left camp on the morning of May 9th he went to Collins' and remained there three or four minutes and then went to John Wilkerson's home; got there about 11 o'clock and stayed until about 3:30 or 4 in the afternoon with Jack Falling, and then went to Lee Foster's; that on the way from Wilkerson's to Lee

Foster's he met Mr. Kirkwood right at the Verdigris bridge; that he was traveling east and Kirkwood going west; that he talked with Kirkwood, who never mentioned "Arkansas' " name to him; that he spent the night of May 9th at Lee Foster's, and left there about 7 the next morning on the road to Claremore with Lee Foster; that he slept with Russell Foster.

On cross-examination witness testified that he told Bruce Collins at about 10 o'clock May 9th that he was going over to Foster's place; that he helped the Jones boys load the wagon that morning; they had five hundred pounds of sugar and two sacks of chops and other things in the wagon; that he left the camp before the Jones boys; that Ammon Rowden left there before he did.

Ammon Rowden, recalled as a witness in rebuttal for the state, testified in substance that he had never had Ben Collins' rifle down at the camp at any time while they were making whisky; that he never met John Vinita out in the woods as testified to by John Vinita on the morning of May 9th.

James Canfield, recalled as a witness in rebuttal for the state, testified in substance that Ammon Rowden never had possession of a rifle down at the whisky camp during the time that the witness was there; that he had seen Bruce Collins with the gun down there; that he never saw Ammon Rowden have a rifle the morning that they broke camp.

Louis Jury, a witness for the state in rebuttal, testified that he is fifty-four years old, the father of Bancroft Jury; that Bancroft was thirteen years old; that Mrs. Collins came to his place on the morning of the 9th of May about 10 o'clock in the morning; that it is about 4 miles or 4½ from Collins' place to his place; that it takes about an hour to make the drive at an ordinary gait.

Bill Jury, called as a witness in rebuttal for the state, testified that he was living with his father, Louis Jury, about 7 miles northeast of Collinsville on May 9, 1921; that he remembered Mrs. Collins being over on that day; that he was planting corn that day, and came into the house about 11 o'clock that morning; that Mrs. Collins was still there; that her daughter Hazel Moody was with her; that they left there between 11 and 12 o'clock that day; that Bancroft Jury went with them; that it is about 4 or 5 miles from Collins' place to their place, and that it takes about an hour to drive it.

Mrs. John Langley, called as a witness for the state, testified that she is a native of Indian Territory, a Cherokee Indian by blood, and that she knew Mrs. Bruce Collins; that she saw Mrs. Bruce Collins in Claremore on the morning of the 15th of September, 1921, near the Farmer's State Bank; that she had a conversation at that time; that Mrs. Collins asked her not to testify that she saw George Rowden talking to Albert Kirkwood on the dump west of Claremore on the evening of May 9, 1921, and that in such conversation Mrs. Collins stated that they had to protect George Rowden in the trial in order to help Bruce Collins.

Belle Niece, recalled as a witness in behalf of the defendant, testified that her father did not tell her on May 9th at his home in the presence of Ammon Rowden and George that they were going out to get the whisky and still from the Jones boys.

The foregoing is substantially the material evidence in the case. Numerous details of minor importance have been omitted. The record is very voluminous; the trial having consumed a period of over four days.

James S. Davenport and Jennings, Hall & Battenfield, for plaintiffs in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). There is but one question involved in this appeal; the insufficiency of the evidence to sustain the conviction. For that reason the court has deemed it expedient to set out at considerable length in the statement of the case a detail of the testimony of witnesses in order that a comprehensive understanding may be had of the issues involved, thereby avoiding an extended argument on the sufficiency of the evidence.

It is contended that this conviction is based on the testimony of one Ammon Rowden, an alleged accomplice of these defendants, and that there is no sufficient evidence to corroborate the said accomplice.

The statute of this state requires, and this court has repeatedly held, that one may not be convicted on the uncorroborated testimony of an accomplice, and further that, if there be corroborating evidence, such evidence must go further than to show merely the commission of the offense, and must be such that tends to connect the defendant with the commission thereof. Section 2701, Comp. Stats. 1921; Kirk v. State, 10 Okla. Cr. 281, 135 Pac. 1156.

Further, this court has held that when the facts are not disputed it becomes a question of law for the court to say whether a witness is an accomplice. Cudjoe v. State, 12 Okla. Cr. 246, 154 Pac. 500, L. R. A. 1916F, 1251; McKinney v. State, 20 Okla. Cr. 134, 201 Pac. 673.

On the other hand, where there is a dispute as to whether a witness did certain things which would make him an accomplice, the matter is for the jury. Cudjoe v. State, supra; McKinney v. State, supra.

On the questions of accomplices and accomplice testimony the court gave the following instructions:

"No. 3. You are instructed that all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, are principals and are punishable under the law.

"You are instructed that by the term "concerned in the commission of a crime" means that one must either commit the crime himself, procure it to be done, or aid and abet in its commission. A mere mental assent or acquiescence in the commission of a crime by one who did not procure or advise its commission, who takes no part therein, gives no counsel or word of encouragement to the perpetrator of the crime, does not in law constitute such a person a participant in the crime.

"You are instructed that 'aid and abet,' and 'aiding and abetting,' as used in these instructions, means to assist and supplement the efforts of another in the commission of a crime with knowledge of the wrongful purpose of such other person, or giving counsel and encouragement to such other person in the commission of such crime."

"No. 9. You are instructed that the prosecution in this case uses the testimony of a witness who may be culpably implicated in the commission of the crime of which the defendants are accused; that is, he may be one who knowingly and voluntarily co-operated or aided or assisted in the commission of the crime of which the defendants are accused. And whether or not he is such a person is a question of fact for you to determine from the evidence before you. If you believe from the evidence in the case that such witness is implicated in the crime charged in the information as above defined, then in law such witness is an accomplice, and you are instructed that a conviction cannot be had upon the testimony of an accomplice unless such witness be corroborated by such other evidence as tends to connect the defendants with the commission of the offense, and the corroboration is not sufficient if it merely shows the commis-

sion of the offense or the circumstances thereof, but such other evidence to be sufficient to corroborate the evidence of an accomplice must tend to connect the defendants with the commission of the crime of which the defendants are accused."

There is a sufficient dispute in the evidence to have authorized the trial court to submit to the determination of the jury the question of whether the witness Ammon Rowden was culpably implicated with Bruce Collins and George Rowden in the commission of the offense. If the jury found that he was not an accomplice (which they could have done under the evidence), then the testimony of Ammon Rowden alone, if believed, is sufficient to sustain this conviction. Dickson v. State, 26 Okla. Cr. 403, 224 Pac. 723; Highfill v. State, 26 Okla. Cr. 420, 224 Pac. 729.

However, if it be conceded that the jury arrived at the conclusion that Ammon Rowden was an accomplice, there is sufficient corroboration of his testimony in that given by Canfield, and the credibility of these witnesses was a matter solely for the jury.

Evidence corroborating an accomplice need not cover every material point testified to by the accomplice or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that fact infer that he speaks the truth as to all. Moody v. State, 13 Okla. Cr. 327, 164 Pac. 676.

Here the defendants each interposed as their defenses an alibi, and on this phase of the law the court gave the following instructions:

"You are further instructed that the defendants in this case have interposed as one of their defenses what is known in law as an alibi; that is, that the defendants were at an-

other and different place at the time of the commission of the crime alleged and charged in the information herein, and therefore could not have committed the crime. The law is that such a defense is proper and legitimate, and the jury should consider all the evidence bearing upon this point, whether introduced by the state or the defendants, and if, after a careful consideration of all the evidence in the case, you are convinced beyond a reasonable doubt that the defendants were not at another and a different place at the time of the commission of the crime charged in the information, then the defense known in law as an alibi has failed, and you should then consider the case the same as if the defendants had never interposed this defense. But if you entertain a reasonable doubt, after a careful consideration of all the evidence in the case, as to whether the defendants were in such other and different place at the time the crime was committed, then you should resolve that doubt in favor of the defendants and acquit them.''

The court also covered the law with respect to conspiracies. The instructions as a whole are intelligent and comprehensive, and cover in an able manner every possible phase of the law of the case disclosed by the evidence. We find no error in them (considered either separately or collectively) prejudicial to the substantial rights of these defendants.

While there is some conflict in the evidence, we think the circumstances surrounding this killing as detailed by the witness Canfield strongly corroborate the testimony of Ammon Rowden and impress an impartial reader of this evidence with the conviction of the truthfulness of Rowden's testimony.

This crime is one of a most horrifying and brutal nature. That the jury did not fix the punishment at death instead of imprisonment for life was due, no doubt, largely to the fact that the deceased himself was and had been a law violator.

These defendants were ably idefended in the court below by several of the best exponents of criminal law in this state. They were afforded a fair and impartial trial. If any errors were committed, they were of such minor importance as not to deserve serious consideration as having in any degree prejudiced these idefendants before the jury. The judgment as to each defendant is affirmed.

BESSEY and DOYLE, JJ., concur.